Good morning ladies and gentlemen. I will mention that Judge Rovner is here with us by video, so the lawyers arguing will see her on the screen. The rest of you will just have to take this on faith, listen to her. But we are ready this morning for our first case, which is Hanna v. City of Chicago. Mr. Samberg Champion. Good morning, Your Honors, and may it please the court. Judge Rovner, are you able to see me? Yes, I can see you. Okay. Yes. Yes. Very handsome. Thank you. Thank you, Your Honor. I assume that's binding precedent of the court. Your Honors, my name is Sasha Samberg Champion and I'm here on behalf of Albert Hanna, the appellant in this case. Your Honors, our contention is that this is a each year the City of Chicago applied for and received millions of dollars in federal housing fines. Did Chicago every year, though, file a report saying that it was doing miserably on the job of of creating public housing? It was not deeply segregated. I mean, what was the secret here? I guess I'm trying to get at what the public the public housing aspect is a little bit different, as you as you well know, Judge Wood. They have a separate issue with their public housing, but they did not file anything with the federal government that would have put the federal government on notice that its affordable housing was ended up concentrated almost entirely in predominantly African-American and minority neighborhoods in direct contravention of, I'm sorry. Could we start with the Fourth Circuit case of Wilson? Yes. Because that case rejected a claim that, like this one, was based on a generalized obligation because a court can't determine that such a generalized promise is an objective falsehood. And wouldn't that be the proper analysis here in that there, I mean, what's the meaningful way for a court to assess whether a city is complying with a promise to further to further fair housing? Okay, well let me let me answer your question twice because there are essentially two major duties that we're talking about. And I'll start with the one that you just named, the promise to affirmatively further fair housing. This is not such a vague and nebulous promise. It actually is very well defined both in the guidance that HUD gives and actually it's defined even in the certifications that the city signs. The certification it actually signs says the jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction and take appropriate actions to overcome the effects of any impediments identified through that analysis. That's what it actually signs and that's what it says also in the HUD handbook for participants, which we've provided you with a link to and which is cited in our complaint. So there's actually considerable specific procedural and substantive content that is provided to the city. It was well on notice that it had to look for impediments of fair housing, which we submit any fair analysis would have identified the aldermanic privilege as one such impediment. Could we stop on the aldermanic privilege? You mentioned that and I want you to explain to me what you really mean by that. A de facto exercise of power by each alderman in Chicago's various wards? A de jure statement in the zoning law that anything the zoning law says can be overridden by the local alderman? What are you talking about? Well what we're actually talking about is more of a de facto than a de jure. It's the accepted practice within the city. So I guess I'm having specificity problems even with that. You agree, do you not, that this complaint is governed by Rule 9b? With respect to the circumstances constituting fraud, yes. Right, so we need to know something more than, well the aldermen exercise a lot of power. Aldermen are different for one thing. The way each ward is run probably reflects the political base for the alderman, lots of other things. I'm having trouble just sort of waving my hands and saying aldermanic privilege. Well let me be clear, we're not saying the aldermanic privilege constitutes the fraud. It could be the other way around. Some aldermen could be exercising their authority to enhance affordable housing in their ward. Well one might think that in theory, but the results which we've alleged in our complaint are stark, which is that affordable housing never gets built in predominantly white wealthy neighborhoods and it doesn't get built in predominantly white wealthy neighborhoods because the aldermen in those jurisdictions have predictable political incentives to oppose them. Why isn't the reason because property values are high? Well again, so it's only for one reason. Well let me back up for a minute. The reasons that they do what they do are actually not the fraud. The fraud is that the city was promising outcomes. It was promising outcomes with respect to the placement of affordable housing and removing impediments. Was it promising outcomes or process? Well okay, so that's the second. So remember I said that was the affirmatively furthering fair housing obligation. In addition, there are regulations that specifically require certain outcomes and I think that the regulation that best describes this duty, which unfortunately we didn't provide in our brief, but it's encompassed among the complaint, is 24 CFR 983.57 and that sets out exactly where affordable housing built with home funds can and can't be built and it clearly says that you can't build affordable housing only in predominantly minority neighborhoods. It's a clearly stated duty. That also again appears in all the HUD guidance. This is not a surprising obligation. It's not an unclear obligation. But you know I guess I want to get back to what you think the specifics are that the city did wrong because that's what 9b calls for. Because as you just alluded to a few minutes ago, the process in Chicago of coming up with affordable housing, whether it's CHA, whether it's other kinds of housing, whether it's section 8, is a lengthy saga in this city. Starting with maybe even before the Gautreaux case, but obviously that prominently and you are in fact looking, if not at purely private, at federally assisted affordable housing. And the city has admitted it was heavily segregated. It seems to me the map that you put in is something that anybody could draw with the assistance of census data. So I don't know what the big secret is about that and I don't know what Mr. Hanna brings to the table. Okay, so let me take your last point first about what Mr. Hanna brings to the table. Although of course we're not right now talking about public disclosure before this court. Obviously this court is interested in that. The facts that we've pleaded regarding where this affordable housing ended up being located almost entirely during this period in predominantly African-American, predominantly poor neighborhoods. That has never been disclosed in any public document, never been compiled before. This is his original research, this is his original study with his time and his money. Based on publicly available data. Some of it based on publicly available data, some of it not. But this is, but and again we haven't gotten into, we haven't, you know, gotten into the details of that because that hasn't been briefed yet as a factual matter. Who is deceived by this? HUD is deceived by this. HUD receives certifications each year from the city saying that it will affirmatively and identify impediments to fair housing that will affirmatively address it and that will comply with these regulations regarding where housing, affordable housing built with federal money will be Well certainly if HUD had known about this case, it might well, had known about this it might well have. Part of our claim here is that the city did not provide HUD with the information that would have been necessary for HUD to pursue it. It certainly did not provide HUD with the information that we plead in the complaint in terms of the outcomes of where these affordable housing developments ended up being built. Without that I don't know that HUD could have understood that. I don't understand. You really think HUD is fooled? You think HUD is unaware of, you know, the role of the aldermen and so on? Well it is not that necessarily the HUD is... Chicago is a huge city and HUD presumably keeps tabs on these large cities, doesn't it? Well HUD receives submissions from many jurisdictions every year and it doesn't have a problem. But Chicago is the third largest city in the United States, so you think they'd pay particular attention, it has a large black population, so you think HUD would pay attention? Well they might pay attention, yeah. How would it be fooled? I don't understand. Well it would be fooled in a couple ways. First of all it would be assuming that the city was doing everything necessary. Why would it assume that? Well because the city told it it was. But why would it assume that year? I mean I can imagine maybe in year one or even in years one through three that you're asking us to assume that since 1965 HUD has blindly gone along, discovered that nothing ever changes, and somehow thinks that the city's doing all that it could. And your only suggestions about other things the city should do is somehow bring the aldermen under control and change the zoning law. Well let me... there's a premise in there that I want to push back on because I think that may be important to your thinking about this. The current situation in terms of the aldermen having the authority to block these developments is a comparatively new situation. Until relatively recently there was a period of time in which this money went directly to developers rather than being funneled through the city council. And therefore the aldermen couldn't control that. In addition... Were the outcomes better in your view during that time? And the outcomes were significantly different and that's one thing we've pleaded. During that time it was almost an even balance in terms of where the affordable housing... But HUD presumably is aware of how things have changed. Well the other major thing that has changed during the period that we've described is that more recently in 2000 and 2004, Chicago further empowered the aldermen to block developments by upzoning properties, by imposing new requirements that could only be... that would block developments unless you had specific... But these are not secrets. That part may not be a secret but it was not going to be possible for HUD to put together that the city was not doing what it was required to do to overcome those effects. You must think HUD is really made up of a group of... We can't hear you Judge Rohnert. Oh... It seems to me that you must think that HUD is made up of a group of ostriches. Well, without getting into what I think of HUD, I won't address that question. But seriously HUD relies heavily on these certifications. It cannot and does not regularly follow through to see whether people are in fact complying with what they're saying they're doing. The Affirmatively Furthering Fair Housing Requirement in particular... So what is HUD doing? Well, what HUD is doing is... Just sit there and... Unfortunately, oftentimes it's what it's doing because it doesn't have the police force to go out and do more but it reviews carefully the submissions that the city made. Police force? What's that? I'm sorry, Judge. It doesn't have a police force. You mean investigators, I assume. But what I want to know, again, I want to get back to 9B particularity. Yes. First of all, you're talking about aldermanic privilege. But I didn't see specifics of Alderman A Overroad Project B. I didn't see specifics about the so-called upzoning that you're talking about, how exactly that happened, what it did for the possibility of affordable care. Even if one were to agree with your position, which I'm inclined to agree with, that you don't have to get right down to the bureaucrat who said no on that particular day. But I just have the feeling, looking at this whole thing, that it's at a very high level of generality which might be okay for Rule 8, but it's not okay for Rule 9B. Well, let me answer that briefly, and then I see my white light is on. But to answer that briefly, again, it's not our contention that any particular action by any particular alderman constitutes the fraud here. Our contention is that the city was aware or should have been aware of the collective effect of these aldermanic practices. And that's what made it a lie when it's certified each year that it was in compliance with these applications, not any particular aldermanic actions. If you'd like to save the rest for your rebuttal, that would be fine. Thank you, Your Honor. Mr. Collins. May it please the Court. The District Court properly rejected Mr. Hanna's claim that the city defrauded the United States of a billion dollars in federal funds. So if the city kept saying, though, we are doing everything we can to spread affordable housing around the city and not to concentrate it in majority-minority neighborhoods, but in fact what the city's doing is just sitting on its hands doing nothing and filing reports every year saying, yep, we still have a big problem year in and year out. Is that being honest with HUD? It is, Your Honor, because the obligations at issue here leave room for considerable discretion in the funding recipients. But what if the recipient actually doesn't intend to do a thing? They just want the alderman to keep running their wards just the way they want to and the city says, well, as long as we report accurately every year that Chicago is still deeply segregated, we're off the hook. Is that really what the federal laws and regulations require? Well, respectfully, Your Honor, that's not what's being alleged here. There's no allegation, for example, that the city promised to spend money on affordable housing but spent it on something else or that the city lied about the location of any of its construction projects. There's no allegation of that kind of deception. And I'd like to, if I may have the Court's indulgence here, I'd like to quote from the HUD guidance document that Mr. Hannah cites in footnote 4 of his reply brief, which is called Fair Housing for Home Participants. It says that participating jurisdictions have considerable discretion in determining, among other things, how they define fair housing and its impediments and what actions they will undertake to overcome the effects of those impediments. So by the very nature of this relationship between HUD and funding recipients, recipients have considerable discretion in how they choose to handle issues such as housing segregation. And Mr. Hannah may have a different opinion about how the city should best approach issues such as segregation, but his opinion does not give rise or does not support the idea that the city stated an objective falsehood in its certifications as is required under the False Claims Act. So that's... What does the city say... ...is required here as far as identifying the person who was responsible for the certification? Your Honor, our position is that Mr. Hannah didn't necessarily have to name names in his complaint, but he at least had to allege facts supporting an inference that some person within the city knew of the alleged fraud at issue here. Because the city as a municipal corporation only knows what its employees know. And the city cannot be given... Knowledge cannot be attributed to the city absent knowledge among its actual employees. And Mr. Hannah makes no allegation regarding the knowledge of any city employee. And indeed, any such inference would be implausible here given that his claim of fraud rests on his subjective interpretation of what the federal civil rights obligations mean. But knowledge can be pleaded generally, even under 9b. You don't have to, you know, delve into somebody's brain to plead that. Correct. We would submit that this is a 12b6 issue because since the city only knows what its employees know, Mr. Hannah had to allege knowledge by an actual employee. But the certifier of these reports... There has to be a person in the city that... You know, into the proverbial mailbox or email or whatever it is you do for these reports, upload them somehow. There are responsible people in the city and they are taken to stand behind the certifications they make. And it's very troubling to think, I guess on your view, an acceptable outcome is for the city to say, well, residential segregation is incurable in Chicago, so we're just going to live with it. Especially that's not our position, that segregation is incurable or somehow acceptable. It's that how to address and ameliorate housing segregation is a matter that involves considerable discretion. But is it OK for a period of 40 or 50 years to pursue the same unsuccessful strategies? If indeed these strategies are unsuccessful, as Mr. Hannah alleges, then that would be a matter for HUD to work with the city through and find other ways. Has HUD made any appearance in the case or filed an amicus curiae brief or something? There's no amicus brief, Your Honour. The United States, of course, had an opportunity to intervene. The United States had the opportunity to intervene in the suit as a key TAM action and the United States refused to intervene. Wait, I'm not hearing you. Have they appeared or filed an amicus curiae brief? HUD has not, Your Honour. Have they said anything about the case? No, they have not. No, all you're saying is they knew about it, they elected not to make an appearance, although they had that choice because it was a key TAM suit, but they opted against it. You don't read anything into that, by the way, but it's a fact. Given the scope of the fraud alleged here, we submit that the fact that the United States chose not to intervene... You can read something into it. Yes. When you have a large agency which is said to be a victim of fraud, you think they might say something. Absolutely. Given the amount of money that's alleged... We were angry, we were deceived, we're going to go after them. Correct. And so... Well, with the vagueness of the certification, do you think prohibit this action even if the plaintiff had evidence that the city took no action whatsoever to further desegregation or even affirmatively sought to steer housing in a manner that might possibly increase segregation? Certainly, Your Honour, that would be a different case from what we have here. If there were an allegation that, for example, the city engaged in purposeful discrimination in, for example, blocking a particular housing development in a certain part of the city. But that's, to be sure, not what's being alleged here. Rather, it's that the city has in place general policies that Mr. Hanna believes have the effect of not furthering affirmative housing... Not furthering fair housing to the extent that he would prefer. What about the change Mr. Sandberg-Champion mentioned from having the money go directly to the developers to this aldermanic system? He says the results used to be better until the mid-2000s or whenever that was. We accept that allegation as stated in the complaint is true. However, there's no allegation that HUD was deceived with respect to this change in policy. HUD knew that this change took place. So the change involves a different pathway to getting funds, is that it? According to the complaint. Yes, that's right. Has HUD ever questioned or challenged aldermanic privilege? Not to my knowledge, Your Honor. Indeed, HUD has not challenged any of the policies that are alleged here, aldermanic privilege or the landmarks ordinance or downzoning. So HUD has never raised any objection to the conduct at issue here. So I assume the downzoning just refers to... How usual across the country is aldermanic privilege? I'm sorry, Your Honor, could you repeat that? How usual across the country is aldermanic privilege? Or are we one of a very few cities or the only city or... I'm sorry, Your Honor, I just don't know. And I don't want to speculate on that question, how other jurisdictions handle their disbursement of funds. But again, there's no allegation that in this case, HUD did not know about the policy or the practice of aldermanic privilege. So... Isn't this, aren't we really talking around the public disclosure bar here, which is a point that may not quite be before us? Well, Your Honor, as we understand the public disclosure bar, for that bar to apply, all the elements of the fraud had to have been publicly disclosed. And it's our position, based on the status of the case, right now at least, that there's no... There has not been public disclosure that would support an inference of CNTR in this case, that the city knowingly defrauded the federal government by virtue of these policies that it has in place. And what kind of evidence do you think would do the trick? Do the trick that the city... Some hypothetical other case, not yours, you know. Well, Your Honor, the only other case that we're aware of, where there has been a successful false claims ad case based on these housing certifications was the Westchester County case, which is cited in Mr. Hanna's briefs. But in that case, that case involved a specific promise to the government to consider race in conducting an analysis of impediments. And it was found that the county, in fact, well, despite making that promise, was not actually considering race. And so that promise, as an objective matter, was false. It was a black-and-white question. And that's just not the type of promises that we have at issue in this case here. Has Chicago ever promised to conduct some kind of objective assessment of where housing should go? Because it seems to me one of the roots of Mr. Hanna's complaint is that it's all extremely subjective. You know, wherever the alderman wants it to go, wherever, you know, winks and nods may take it, which is adverse to the mission to desegregate the city. Your Honor, I'm not aware of any promise or indeed any obligation from HUD to conduct, if I understand correctly, this kind of objective analysis. On the contrary, the city has disclosed to HUD the fact of segregation in the city and the longstanding segregation that has existed. So there's been absolutely no deception in that regard either. And so to summarize, this complaint was properly dismissed because it fails to adequately allege a false statement is required under the Act or that any such false statement was made knowingly. And if the Court has no further questions, the judgment to be affirmed. Thank you. All right, thank you. Mr. Sandberg-Champion. Thank you, Your Honor. Let me address very briefly first these scienter requirements of the False Claims Act. The argument that you just heard is doubly wrong. It's doubly wrong because first, it builds in the assumption that we need to meet a standard of proof ultimately, which we don't have to meet. We don't have to show that anyone or the city as a whole had actual knowledge of the false city of its claims. We only have to show that it was recklessly, that it acted in reckless disregard of the truth or deliberate indifference. It may well turn out that no one ever bothered to check where these affordable housing units were built, for example. We think that would qualify as sufficient scienter. It may be that no one ever bothered to check what was required to do a proper analysis of impediments. Again, we think that would satisfy the scienter requirement. We don't have to show that anyone had actual knowledge. Otherwise, you really could never bring a False Claims Act against a bureaucracy like this one for failing to meet its promises. The second point that I want to address that was just raised was, it is entirely true that HUD gives a great deal of discretion to jurisdictions as to how they want to affirmatively further fair housing. But as this court knows very well, it is an abuse of that discretion if you don't even make an attempt to apply what has been given to you. That's what we're looking at. Okay, you need to wrap up now. Okay, thank you, Your Honor. Okay, thank you very much. Thanks to both counsel. We'll take the case under advisement.